**APPLE COMPUTER, INC., Plaintiff,**

v.

**MICROSOFT CORPORATION and Hewlett–Packard Company, Defendants.**

No. C–88–20149–VRW.

United States District Court, N.D. California.

May 18, 1993.

Jack E. Brown, Brown & Bain, P.A., Phoenix, AZ, Lois W. Abraham, Chris R. Otten-

**618**

weller, Martin L. Lagod, Brown & Bain, Palo Alto, CA, Bernard Petrie, San Francisco, CA, for plaintiff Apple Computer, Inc.

David T. McDonald, Karl J. Quackenbush, McDonald & Quackenbush, P.S., William O. Ferron, Seed & Berry, Seattle, WA, John N. Hauser, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, David H. Binney, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, WA, for defendant Microsoft Corp.

Jonathan A. Marshall, William G. Pecau, Jon R. Stark, Steven I. Wallach, Pennie & Edmonds, New York City, Neil Boorstyn, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, Stephen P. Fox, Roland I. Griffin, Hewlett–Packard Co., Palo Alto, CA, for defendant Hewlett–Packard Co.

## ORDER ADDRESSING MOTIONS FOR RECONSIDERATION, FOR SUMMARY JUDGMENT FOR LACK OF SUBSTANTIAL SIMILARITY AND FOR CONTRIBUTORY INFRINGEMENT.

WALKER, District Judge.

On May 5, 1993, at 2:00 p.m., the court conducted a hearing to address the following issues:

(1) Hewlett–Packard Company's ("HP") and Microsoft Corporation's ("Microsoft") motions for summary judgment for lack of substantial similarity;

(2) Apple Computer, Inc.'s ("Apple") motion to reconsider the court's April 14, 1993, ruling directing application of the virtual identity standard in determining the similarity of defendants' works as a whole;

(3) Microsoft's motion for summary judgment on Apple's contributory infringement claim; and

(4) Apple's claim that HP cannot rely on the November 22, 1985 license agreement ("1985 Agreement") as a defense to Apple's infringement claim.

Shortly before the May 5 hearing, the court issued tentative rulings on each of the foregoing motions and invited the parties to direct their comments accordingly. Having considered the extensive and capable oral arguments of counsel and having reviewed the papers, declarations and exhibits submitted, the court hereby: (1) **GRANTS** in part and **DENIES** in part Microsoft's motion for summary judgment for lack of substantial similarity; (2) **GRANTS** in part and **DENIES** in part HP's motion for summary judgment for lack of substantial similarity; (3) **DENIES** Apple's motion for reconsideration; (4) **DENIES** Microsoft's motion for summary judgment on Apple's contributory infringement claim; and (5) **DENIES** Apple's motion regarding HP's lack of a sublicense under the 1985 Agreement.

In addition, HP requested the court to rule on its Motion For Summary Judgment That It Is Not Jointly And Severally Liable With Microsoft and its Motion for Summary Judgment On The Literary And Application Program Works In Suit. Microsoft also urged the court to rule on its Motion For Partial Summary Judgment Dismissing Apple's Claims Against Windows 2.03 and 3.0 Based On Certain Copyrights before the commencement of trial. Having reviewed the papers submitted, the court hereby **DENIES** HP's first motion, **GRANTS** HP's second motion, and **GRANTS** Microsoft's motion dismissing Apple's claims against Windows based on certain copyrights.

### I.

■ To prevail on its claim of copyright infringement, Apple must ultimately prove both ownership of a valid copyright and copying of protected expression by defendants. Copying may be inferred from (1) access to the copyrighted work by defendants and (2) substantial similarity of both ideas and expression between the copyrighted work and the allegedly infringing work. *Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 206 (9th Cir.1988).

As articulated in *Apple Computer, Inc. v. Microsoft Corp.*, 799 F.Supp. 1006 (N.D.Cal. 1992) (hereinafter "August 7 order"), the Ninth Circuit employs a two-part analysis for determining substantial similarity: extrinsic and intrinsic tests. The extrinsic test is an objective one to determine whether there is

substantial similarity in the ideas; it depends upon specific criteria which can be listed and analyzed. Analytic dissection is appropriate. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir.1977); *Shaw v. Lindheim*, 919 F.2d 1353, 1357 (9th Cir.1990). The intrinsic test is a subjective one to determine whether there is substantial similarity in expression; it depends on the response of the ordinary reasonable person. *Krofft*, 562 F.2d at 1164. Infringement can only be found if each of the two parts is satisfied. *Id.; Olson v. National Broadcasting Co., Inc.*, 855 F.2d 1446, 1449 (9th Cir.1988); *Frybarger v. International Business Machines Corp.*, 812 F.2d 525, 529 (9th Cir.1987).

In the present case, the parties do not dispute Apple's ownership of valid copyrights, and defendants clearly had access to Apple's copyrighted works. The only remaining issue is whether defendants' works are substantially similar in both ideas and expression to warrant a finding of infringement.

Here, the court has already completed the extrinsic analysis and summarized its results in the August 7 order. In that order, the court determined that the vast majority of the allegedly similar items were unprotectible due to merger, scènes à faire, functionality and unoriginality. Of the approximately one-hundred fifty alleged similarities, the court found that only five items—A1, D1, G4, G13 and J10—could possibly be associated with unlicensed artistic expression to be compared under the "virtually identical" standard in the course of intrinsic analysis. *Apple*, 799 F.Supp. at 1041–42. The court also concluded that only items G28, G29, G33 and H2 could be associated with unlicensed artistic expression to be judged under the "substantial similarity" standard during the intrinsic analysis phase. *Id.*

After the court issued the August 7 order, both HP and Microsoft moved for summary judgment for lack of substantial similarity on the remaining elements. Microsoft moved for summary judgment as to items A1, D1 and G4. HP moved for summary judgment as to items A1, D1, G4, G13, J10, G28, G29, G33 and H2. Section II presents the court's rulings on each of these remaining items.

## II.

**A1 The design and layout in Macintosh includes overlapping rectangular windows in front of a muted background pattern.**

■ The only feature of the overlapping windows in the Macintosh Finder and Lisa Desktop which reflects any separate artistic expression is the drop shadow that appears at the right and lower edges of the overlapping windows in those works. As stated in the August 7 order, this item is to be judged on a virtually identical standard. Yet, no version of HP's NewWave nor any version of Microsoft's Windows uses a drop shadow on its windows. Therefore, item A1 in both NewWave and Windows is not virtually identical to item A1 in Macintosh or Lisa.

**D1 Macintosh design animation drags a gray outline of the window along with the cursor when the mouse is pressed on a window's title bar.**

Applying the virtual identity standard as noted by the August 7 order, the court finds that item D1 in all versions of Microsoft's Windows and all versions of HP's NewWave is not virtually identical to item D1 in Apple's works. Apple's works depict a moving window with a thin (single-pixel wide), dotted, gray outline. In contrast, the outlines in each version of the Microsoft and HP works are solid, contrasting colored and of variable width, capable of increasing or decreasing thickness (up to several-pixel wide).

Furthermore, the court previously ruled that the use of an outline to indicate a moving window is not protectible, and Apple has pointed to no separate artistic expression beyond the outline. Accordingly, HP's and Microsoft's motions for lack of similarity as to item D1 are **GRANTED**.

**G4** Macintosh design animation moves an icon to any part of the screen by dragging it along with the cursor when the user presses the mouse on the icon. Windows 2.03 and New-Wave (within the NewWave Office windows) also present the same animation design, appearance and style.

When an icon is moved in Macintosh Finder, the icon is represented by a thin (single-pixel) outline that approximates the shape of the icon and its title. The shape of the outline varies with the length of the icon title and generally resembles an inverted "T". While the outline moves about with the cursor, the icon itself is shown at its original position in inverse video. In Lisa Desktop, a moving icon is shown by an outline in the shape of the icon that is dragged with the cursor. At its original location the icon is whited-out while the title remains in inverse video.

Each version of NewWave uses visual displays that are markedly different when an icon is moved. The moving icon is represented by a set of thick (several-pixel wide) dark brackets that are the same size and shape regardless of the shape of the icon and the length of its name. At its original position, the icon is grayed-out. These displays are not virtually identical to the corresponding displays of item G4 in Apple's works.

Similarly, each version of Microsoft's Windows employs methods of depicting a moving icon that differ significantly from those used in Macintosh and Lisa. For example, in Windows 3.0 and 2.03, the moving icon is represented not by an outline or square brackets but by a complete icon with all its details. Also, while the user moves the icon to a new position, nothing remains at the original position, not even an inverse video image or a whited-out shadow. Accordingly, the court **GRANTS** HP's and Microsoft's motions for summary judgment for lack of virtual identity as to item G4.

**G13** The design and layout in Macintosh presents different images within the outline of a generic page icon to indicate objects of different non-directory type.

In its August 7 order, the court held that the actual depiction of the images in the page icons can be protectible. Apple has . not, however, identified any particular icon images in any version of NewWave that Apple contends is similar to any particular icon images in the Macintosh or Lisa works. Each image within a page icon in the three versions of NewWave is different from those images contained in Apple's works. Notably, NewWave 3.0 uses color and perspective. Although images in the page icons of New-Wave 1.0 and NewWave 1.0 Developer's Release more closely resemble those pictures in Apple's works, many of these similarities arise out of the need for the picture on the icon's face to reveal the contents of the folder or the functionality of the program. For example, a folder which contains a bar chart should normally depict a bar chart on the face of the icon. In no instance, however, are any such images in any version of New-Wave virtually identical to the images used within Macintosh or Lisa page icons. Accordingly, HP's motion for lack of virtual identity is **GRANTED** as to item G13.

**J10** The design and layout in Macintosh attributes dialog presents the object's icon, name, type, creation date, modification date, size, and user-specified comment.

The court's August 7 ruling held that the attributes dialog box[1] is not protectible except to the extent that it contains identifiable artwork or a unique arrangement, and in the latter case receives protection only against virtually identical copying. The Macintosh Finder "Get Info" box contains no identifiable artwork, and the arrangement of the NewWave "Attributes" dialog box is not virtually identical.

In NewWave 1.0 and 3.0, the dialog box includes a scroll bar in the comments area;

---

1. An attributes dialog box provides the user with certain basic information about a document or a directory, such as name of the document or directory, date created, date modified, size, type and any special comments from the user.

"OK", "Cancel", and "Help" buttons; an editing field for the icon name; and creator and address information. Macintosh Finder's "Get Info" contains none of these features.

The "Attributes" dialog box in NewWave Developer's Release features the icon on the left and provides an edit field for the icon title, whereas in Macintosh Finder the icon is on the right and its title cannot be edited. Also, like NewWave 1.0 and 3.0, NewWave Developer's Release provides a scroll bar in the comment area; "Done", "Cancel", and "Help" buttons; and identification of the creator and last modifier of the document. The Macintosh Finder provides none of these features. Thus, each version of NewWave has an attributes dialog box that presents different information in a different arrangement in comparison to the attributes dialog box in Macintosh Finder. Lisa Desktop does not have an attributes dialog box. Accordingly, the court finds no virtual identity between Apple's works and HP's works in the expressions corresponding to item J10 and **GRANTS** HP's motion.

 G28 **Macintosh design animation displays a rapid sequence of expanding rectangles beginning at the icon's position and ending at the window's position when an icon is opened into a window.**

 G29 **Macintosh design animation displays a rapid sequence of expanding [sic, contracting] rectangles beginning at the window's position and ending at the icon's position when a window is closed into an icon.**

■ HP draws the court's attention to several differences between the "zooming rectangles" in NewWave and those in Macintosh Finder and Lisa Desktop. Most notably, Macintosh Finder uses rectangles drawn with small, thin (single-pixel wide), black lines and employs an effect characterized by Apple as a "curve ball"[2] effect when opening an icon or closing a window. Lisa Desktop also utilizes thin (single-pixel), black rectangles for its zooming rectangles.

In contrast, HP notes that its NewWave 1.0 and 3.0 employ a set of thick (several-pixel wide) corner brackets, not rectangles, that expand to the final window position. Unlike any of Apple's works, each corner bracket in NewWave appears in a color (often times blue, red or gray) that contrasts with the background displays that it passes over, and no curve-ball effect is used. When an icon is opened in NewWave Developer's Release, HP claims that a set of thick (several-pixel wide) rectangles expands to the final window position, again using contrasting colors but no curve ball effect.

The court finds that the minor variations that HP points to, such as the use of a "curve-ball" effect, brackets instead of solid lines, and contrasting and multiple colors, are likely to be overlooked or dismissed as inconsequential by the average user. Opening or closing a window takes only a fraction of a second. As such, it is difficult to discern the differences noted by HP, especially the absence of the "curve-ball" effect in HP's products. Therefore, the court cannot decide as a matter of law that no reasonable juror would find items G28 and G29 substantially similar. Accordingly, HP's motions for summary judgment for lack of substantial similarity as to items G28 and G29 are **DENIED.**

 G33 **Macintosh design animation indicates that a folder icon has been opened into a window by displaying the icon as dimmed.**

Applying the substantial similarity test as noted by the August 7 order, the court finds that a jury could reasonably conclude that item G33 in all versions of NewWave is substantially similar to item G33 in Apple's works. To be sure, there are minor differences in the way Apple implements icon dimming and the way HP implements dimming. For example, when an icon is opened into a window in Macintosh Finder, the dimming effect replaces the outline of the icon with a dotted area of the same size, eliminating all of the detail that the icon previously featured. The appearance of the icon's title

---

**2.** The "curve ball" effect describes a path traversed by the zooming rectangular windows similar to that traversed by a curve ball pitch in baseball.

remains unchanged, with dark letters on a white background. Similarly, in Lisa Desktop, the outline and all detail in the icon are removed and the title of the icon is unchanged. In addition, no dimming appears in Lisa Desktop, resulting in an effect much like the whiting-out used in the Xerox 8010 Star Information System.

In contrast, after opening an icon into a window in NewWave 3.0, the outline and details of the icon are still visible, the lettering in the title changes from white to black and a thin drop shadow appears at the right and bottom edges of the icon.

The similarities, however, between Apple's works and HP's are even more impressive. As in Macintosh Finder, in NewWave 3.0, a distinctive, dotted gray pattern covers the icon to indicate that the icon has been opened. The same distinctive, dotted gray pattern covers the icon in NewWave 1.0 and NewWave Developer's Release. The court recognizes that there are numerous alternatives to "dimming" to indicate an opened icon, including use of color, changes in texture, shading, blinking, a surrounding box or other shape, or three-dimensional pop-up effects, to name a few. See ¶ 17 of the March 30, 1990 Shneiderman Declaration. Notwithstanding these alternatives, HP adopted animation in all three versions of NewWave that a trier of fact could reasonably conclude is substantially similar to Apple's dimming effect. Accordingly, the court **DENIES** HP's motion for summary judgment for lack of substantial similarity as to item G33.

**H2 The design and layout in Macintosh displays the special discard folder as an icon resembling a trash can (as does Lisa).**

A simple comparison of the "Waste Basket" icons used in NewWave 3.0 and NewWave 1.0 reveals that each icon is dissimilar from the "Trash" icons used in the Macintosh and Lisa works. The "Trash" icon in Macintosh Finder is a two-dimensional side view of an outdoor alley-style cylindrical garbage can. The depiction includes a set of four vertical lines to simulate a ribbed or fluted surface, and a closed lid with a handle on top. The Lisa Desktop "Waste Basket" icon shows the same view of an alley-style garbage can, also with vertical lines to indicate a ribbed surface, but with an open lid and a handle on the front of the can.

In contrast, the "Waste Basket" icons in NewWave 3.0 and 1.0 are perspective views of an indoor kitchen-style rectangular flip-top container. The NewWave 3.0 and 1.0 icons include a foot pedal and depict the top as partially open. In addition, the NewWave 3.0 icon is displayed in a box that appears to be recessed into the desktop. In short, the waste basket icons in NewWave 3.0 and 1.0 constitute different artistic expressions from that contained in the trash icons in Macintosh Finder and Lisa Desktop. Thus, item H2 in NewWave 3.0 and 1.0 is not substantially similar to item H2 in any of Apple's works, and HP's motion is **GRANTED** as to NewWave 3.0 and 1.0.

The same, however, cannot be said of NewWave Developer's Release. Like the garbage icons in the Macintosh and Lisa, the "Waste Basket" icon in NewWave Developer's Release is depicted as an outdoor alley-style cylindrical garbage can with a lid and a handle on the top. Although the garbage can in NewWave Developer's Release does not have vertical lines to indicate a fluted surface or a handle, a trier of fact could reasonably find substantial similarity between it and the garbage icons in Apple's works. Accordingly, HP's motion for lack of substantial similarity is **DENIED** as to item H2 in NewWave Developer's Release.

A summary of the court's rulings with respect to each item discussed above is provided in attached Table A.

## III.

In its tentative ruling dated May 5, 1993, the court proposed submission of the following issues for trial:

(1) Applying the appropriate test to each element, are the remaining unadjudicated elements substantially similar or virtually identical to their equivalents in Apple's works?

(2) If so, does the presence of the elements found to be substantially similar

or virtually identical significantly alter the works in suit as a whole?

(3) If the answer to (2) is yes, are the allegedly infringing works, viewed as a whole, substantially similar to the copyrighted work?

If the answer to (2) is no, are the allegedly infringing works, viewed as a whole, virtually identical to the copyrighted work?

### A.

■ In section II above, the court granted summary judgment in Microsoft's favor on each of the remaining protectible elements found in Windows, namely items A1, D1 and G4. See attached Table A. In so doing, the court has determined that Microsoft's Windows consists only of elements that are either unprotectible, licensed, or protectible but lacking sufficient similarity to Apple's works. Even so, Microsoft's Windows may still infringe Apple's works. As noted by the court in *Apple Computer, Inc. v. Microsoft Corp.*, 779 F.Supp. 133, 135–36 (N.D.Cal.1991), copyright protection may attach to an innovative "melding" of unprotectible features. The Ninth Circuit in *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir.1989), held that works consisting largely of uncopyrightable elements are entitled to copyright protection, but receive only limited protection. The court added that infringement should not be found in the absence of "bodily appropriation of expression," and that bodily appropriation occurs only if there is "copying or unauthorized use of substantially the entire item." Id. Hence, because the court has determined that Windows consists only of elements that are either unprotectible, licensed, or protectible but lacking sufficient similarity to Apple's works, the jury must apply the virtual identity standard when comparing the similarities of Microsoft's works as a whole to Apple's.

### B.

■ Although the court found that each remaining protectible element in Windows lacks substantial similarity to any elements in Apple's works, the same may not be true of the protectible elements in NewWave. In

HP's case, the court denied HP's motion for summary judgment as to items G28, G29, G33 and H2 in part. Having made the foregoing rulings, the court now finds that it need not submit question (2) above to the jury. Instead, the court concludes, as a matter of law, that the remaining unadjudicated elements (G28, G29, G33 and H2), even if found substantially similar, do not significantly alter the works in suit as a whole. Thus, the answer to question (2) is negative.

In *Computer Associates International, Inc. v. Altai, Inc.*, 982 F.2d 693, 710 (2d Cir.1992), the Second Circuit stated that after filtering out all unprotectible elements, the court's substantial similarity inquiry should focus on the remaining "core of protectible expression," and whether defendant copied any aspect of this protected expression, as well as *"the copied portion's relative importance with respect to the plaintiff's overall program."* (Emphasis added). Similarly, Professor Nimmer states that "[o]nce plaintiff's work has been filtered down to its protectible core, comparing those protected elements against defendant's program poses essentially a value judgment, involving an assessment of the importance of the material that was copied." 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 13.03[F] at 13–102 (1992).

In the present case, G28, G29, G33 and H2 do not significantly alter (either quantitatively or qualitatively) the works in suit as a whole. Quantitatively these four elements constitute a small fraction of the total work. The audiovisual works in Macintosh and Lisa are complex works, and Apple originally alleged that approximately one-hundred fifty elements of its works were similar to expression in NewWave. Here, the four possibly infringing elements of NewWave are relatively minor in the context of the entire work.

Professor Nimmer states that "[i]n some cases, the amount copied will be so small as to be *de minimis*, and will not justify a finding of substantial similarity." 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 13.03[F] at 13–102 (1992). For example, in *See v. Durang*, 711 F.2d 141, 143 (9th Cir.1983), the Ninth Circuit, upon conducting an analytical dissection of a play, found that five similarities out of twenty

were protectible. The court held that as a matter of law there was no substantial similarity of the works, and affirmed a grant of summary judgment of noninfringement:

> The remaining five similarities are not sufficient to convince any reasonable trier of fact that the [works in suit] are substantially similar.

*Id.*

■ Of course, quantitatively insignificant infringement may be substantial if the material is qualitatively important to plaintiff's work. *Narell v. Freeman,* 872 F.2d 907, 913 (9th Cir.1989). In the present case, however, the remaining four elements also lack qualitative significance to the works in suit.

Items G28 and G29 cover the animation effect achieved by the zooming rectangles every time an icon is opened or a window closed. As mentioned above, it takes only a fraction of a second to open an icon or close a window. Therefore, even if this zooming rectangle effect is important, the whole process is of such short duration that no jury could reasonably conclude that items G28 and G29 are qualitatively significant to the work as a whole. Furthermore, the zooming effect only comes into play when icons are opened or windows closed, which takes up a small percentage of the user's time on the computer.

Item G33 pertains to the dimming of an icon to indicate it has been opened into a window. While a dimmed icon provides useful information to the user, the icons are typically small relative to the entire computer screen. Moreover, when an icon is opened into a window, the newly opened window often covers up the dimmed icon, hiding the dimmed icon from view. No jury could reasonably conclude that the dimmed icon significantly alters the audiovisual works as a whole.

Item H2 covers the trash can icon. While clever, functional and aesthetically pleasing, the trash icon is only one of many such icons displayed on the default screen. Other icons include a "Diagnostic" icon depicted in the form of a wrench, a "Printer" icon shown in the image of a printer, and a "File Drawer" icon illustrated as a filing cabinet drawer full of folders. All of these icons perform some useful function and are depicted in a clever and aesthetically pleasing manner. Thus, because the trash icon is only one of several such icons and because the screen is filled with many other images, the court finds as a matter of law that item H2 does not significantly alter the audiovisual works as a whole.

■ Of course, the law requires the court to consider the collective impact of these four elements on the works in suit, not their individual effect. See *Computer Associates,* 982 F.2d at 710, (court's substantial similarity inquiry should focus on the "*core* of protectible expression") (emphasis added). Yet, the collective impact of items G28, G29, G33 and H2 is *de minimis.* Apple itself has never contended that these four isolated similarities are qualitatively significant to Apple's works as a whole. In fact, Apple itself has consistently maintained that it has never based its infringement claims on just a few items of similarity. At a hearing on April 14, 1992, Apple's counsel explained to the court:

> I don't want to end up with this case saying, "Oh, well, all we have to do is change a trash can or change this or that." That isn't what this case is involving. We didn't bring a small case; we brought a case of tremendous significance to the client and to the industry. It's virtually the most important—certainly the most important case I have ever tried—but it's important because of the impact, the importance of this intellectual property asset of Apple's that they created and they owned and the totality of that expression * * *.

Transcript of April 14, 1992 hearing at 38:24–39:9. Apple's counsel also offered the following explanation of its infringement charge, again dismissing the significance of a few individual alleged similarities:

> *We wouldn't complain * * * if somebody takes a graphical user interface and makes use of the overlapping window. We wouldn't complain if somebody wanted to even use a trash can in the right-hand corner or maybe—obviously we can protect our particular drawing of that * * *, but we wouldn't probably complain if they took that and several other things just as closely as * * * Microsoft and Hewlett-Packard did.*

Id. at 33:3–11 (emphasis added). As Apple has admitted, the remaining items simply do not significantly alter (either quantitatively or qualitatively) the works in suit. Therefore, the answer to question (2) above is negative, and the virtual identity standard provides the appropriate standard when comparing HP's works as a whole to Apple's.

Apple, of course, objects to the court's application of the virtual identity standard in comparing the works as a whole and moves for reconsideration of the court's April 14, 1993, ruling. Apple contends the works in suit are not "compilations" as defined in 17 U.S.C. § 101, and that the court's reliance on *Harper House* to support an application of the virtual identity standard is misplaced.

The applicability of the virtual identity standard does not, however, depend on whether the work at issue is deemed to be a compilation, but rather on the range of possible expression. As the Ninth Circuit explained in *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir.1984),

> Some ideas can be expressed in myriad ways, while others allow only a narrow range of expression. Fictional works generally fall into the first category * * *. An author wishing to write yet another work using the "boy meets girl" idea can choose from a wide range of materials in composing his or her own expression of the idea. Therefore[,] a new work incorporating that idea need not be a verbatim copy or close paraphrase of an earlier work to infringe that work.
>
> \* \* \* \* \* \*
>
> Factual works are different. Subsequent authors wishing to express the ideas contained in a factual work can choose from only a narrow range of expression * * *. Therefore, similarity of expression may have to amount to verbatim reproduction or very close paraphrasing before a factual work will be deemed infringed.

■ Thus, the critical factor in deciding whether to apply a virtual identity standard is whether the work is capable of only a narrow range of expression, not, as Apple contends, whether the work can be labelled a compilation. Although the works at issue here are not "factual" works *per se*, they are works whose ideas can be expressed in limited ways. *Landsberg* teaches that the virtual identity standard should apply in comparing such works, even if they are not true compilations. Accordingly, the court DENIES Apple's motion for reconsideration and **REAFFIRMS** that the jury shall apply a virtual identity standard in comparing the works as a whole.

### IV.

#### A.

Apple alleges that Microsoft is contributorily liable for any infringement by HP, and Microsoft has moved for partial summary judgment on this claim.

■ Liability for contributory infringement arises when a defendant knowingly induces, causes, or materially contributes to the infringing activity. *Gershwin Publishing Corp. v. Columbia Artists Management*, 443 F.2d 1159 (2d Cir.1971); *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987). The participation of the alleged contributory infringer must be "substantial." *Demetriades v. Kaufmann*, 690 F.Supp. 289, 294 (S.D.N.Y.1988).

■ Microsoft contends that it did not materially contribute to the development of NewWave, nor did it exercise any control over the content of NewWave or its visual displays. Microsoft further asserts that the agreement it entered into with HP, which permitted HP to obtain master copies of Windows, make minor hardware-specific adjustments and distribute Windows to end users, was no different from Microsoft's standard OEM (Original Equipment Manufacturer) agreement entered into with other OEMs such as IBM, Compaq and Digital Equipment Corporation. In no event, according to Microsoft, did its agreement with HP constitute a special agreement to split the efforts of developing NewWave.

Apple, on the other hand, maintains that Microsoft and HP had entered into a "highly customized" OEM license agreement in which HP and Microsoft agreed to "split [the] efforts of development." Apple further claims that Microsoft assisted HP with its

NewWave project by making certain changes and enhancements to Windows at HP's request and that Microsoft continues to assist HP in solving NewWave problems, including bug fixing and "a lot of technical issues" related to the management of memory and of system resources.

Microsoft replies that it has hundreds of customers from which it can receive requests for bug fixes and technical information. The fact that it responded to such requests from HP, one of its customers, does not evidence any special relationship between the parties. Accordingly, Microsoft urges the court not to rely on such "routine software developer behavior" as evidence that Microsoft substantially contributed to HP's development of NewWave. The court finds, however, that Apple has raised enough questions of material fact concerning the extent and nature of Microsoft's involvement in the development of HP's NewWave and the nature of the OEM agreement between HP and Microsoft to warrant **DENIAL** of Microsoft's motion for summary judgment on contributory infringement.

### B.

HP also moves for summary adjudication that it is not jointly and severally liable with Microsoft. According to Apple, HP should be held jointly and severally liable with Microsoft because: (1) HP and Microsoft collaborated in the development of a routine called WINOLDAP;[3] (2) HP and Microsoft collaborated in the development of a multidocument interface program ("MDI"); and (3) HP suggested to Microsoft that Microsoft develop a program for overlapping windows.

HP contends that although it did provide modification code for the WINOLDAP program, HP's contribution did not affect the graphic user interface of any of the Windows programs. HP also argues MDI was developed entirely by Microsoft without any assistance from HP. Finally, HP claims that it had no involvement in the design or implementation of overlapping windows in the 2.03 and 3.0 versions of Windows, nor did it suggest including overlapping windows to Microsoft.

Apple, on the other hand, argues just the opposite. According to Apple, (1) HP assisted in the inclusion of enhancements to Windows that added to the infringing nature of Windows; (2) HP encouraged Microsoft to change to overlapping windows and to support the MDI in Windows 2.03; (3) HP developed for Windows 2.03 an application-saving feature adding significant value to the product; and (4) HP assisted in the promotion of Windows through HP's advertising and participation on promotional tours.

Again, the court finds that Apple has raised enough questions of material fact concerning the extent and nature of HP's involvement in the development of Windows and whether HP's contributions, if any, actually affected the graphical user interface of Windows to warrant **DENIAL** of HP's summary judgment motion.

### V.

Apple alleges that HP has no right to rely on the 1985 Agreement between Microsoft and Apple as a defense to copyright infringement because HP admitted in a letter dated August 3, 1992, that "Microsoft did not issue a formal written license to HP specifically sublicensing HP under the 1985 Microsoft/Apple Agreement." See August 3, 1992, letter from Jonathan Marshall.

While it is true that Microsoft issued no "formal written [sub]license to HP," nothing in the 1985 Agreement nor in the copyright law requires Microsoft to enter "formal written" licenses of the type Apple seeks to require. See *Nimmer on Copyright* § 10.-03[A] ("A nonexclusive license may be granted orally, or may even be implied by conduct."). There is no dispute that Microsoft authorized HP to use Windows visual displays in connection with HP's NewWave products. Furthermore, under its 1985 license agreement with Apple, Microsoft clearly had the right and power to do so.

In any event, Judge Schwarzer has already found HP to be a licensee of Microsoft. See *Apple Computer, Inc. v. Microsoft Corp.*, 717 F.Supp. 1428, 1435 (N.D.Cal.1989), which held:

---

**3.** WINOLDAP is software that enables a user to run prior generations of application programs with subsequent generations of Windows programs.

Microsoft and *its licensee HP* are therefore entitled to partial summary judgment on Apple's infringement claim insofar as it is based on the use of Windows 2.03 *and in NewWave* of visual displays in Windows 1.0 and the named application programs. Accordingly, this ruling constitutes a *summary adjudication* that *defendants'* use in Windows 2.03 *and in NewWave* of the visual displays in Windows 1.0 and the named applications programs is protected against Apple's infringement claim by the license provision in the 1985 Agreement.

(Emphasis added).

Thus, Apple's contention is meritless since the facts clearly demonstrate that HP is a licensee of Microsoft, and is therefore entitled to the protection of the 1985 Agreement.

### VI.

In addition, Microsoft requests ruling on its Motion for Partial Summary Judgment Dismissing Apple's Claims Against Windows 2.03 and 3.0 Based on Certain Copyrights, and HP requests the court to rule on its Motion For Summary Judgment On The Literary And Application Program Works In Suit. These two motions are related. In Microsoft's motion, Microsoft moves to dismiss Apple's claims that Windows 2.03 and 3.0 infringe the audiovisual copyrights of MacPaint, MacDraw, MacProject, Macintosh Finder, LisaDraw and LisaProject. In HP's motion, HP moves to dismiss Apple's claims that NewWave infringes MacPaint, MacDraw, MacProject, LisaDraw and LisaProject.

### A.

Apple alleges that Windows 2.03 and 3.0 infringe seven of Apple's separately registered audiovisual works—MacPaint, MacDraw, MacProject, Macintosh Finder, LisaDraw and LisaProject. In its motion, Microsoft seeks to dismiss Apple's claims based on MacPaint, MacDraw, MacProject, Macintosh Finder and LisaDraw on the grounds that: (1) all alleged similarities contained in the works have been determined to be licensed; (2) the remaining alleged similarities are not contained in the works; (3) the works are derivative works whose copyrights do not

extend to the remaining alleged similarities; and (4) the works lack substantial similarity of ideas with Windows 2.03 and 3.0, and so are not infringed. Section 1 below discusses Windows 2.03, while section 2 addresses Windows 3.0.

#### 1.

In Windows 2.03, all of the MacPaint based alleged similarities, sixty in total, have been determined to be licensed. *Apple Computer,* 717 F.Supp. at 1435. Therefore, these visual displays may not form the basis of a copyright infringement claim against Microsoft.

Of the original 189 alleged similarities between Apple's copyrighted works and Windows 2.03, only the following ten remain at issue: A1, A8, B1, B2, D1, D2, D3, G4, G5 and G6. *Apple Computer, Inc. v. Microsoft Corp.,* 717 F.Supp. 1428, 1435 (N.D.Cal.1989). Apple's designated Rule 30(b)(6) witness, Stephen Capps, has testified that these remaining ten alleged similarities are *not* present in Apple's MacPaint, MacDraw or MacProject applications. Accordingly, Apple may not base its claims against Windows 2.03 upon these three works.

Apple disagrees with Microsoft's interpretation of Capps' testimony. According to Apple, Capps was asked a much narrower question, namely whether various visual displays relating to overlapping windows and icons appear in the *"content area"* of the MacDraw, MacPaint or MacProject windows. The "content area" is defined as the area inside the title bar and scroll bars of a window. Apple objects to defendant artificially restricting Capps' attention to the "content area" alone. Apple argues that the works in suit are audiovisual works that consist of and incorporate all visual displays that appear on the screen when the programs are running, not just that which lies within the title bar and scroll bars.

The court finds, however, that the application programs (MacDraw, MacPaint, MacProject, etc.) are responsible only for what appears in the "content area." Other components of Apple's system, namely the System Software, generate the rest of the visual displays, such as the scroll bars and title bar which surround the "content area." Since all of the alleged similarities lie outside the

"content area" and do not arise out of the application programs, the copyrighted application programs MacDraw, MacPaint and MacProject cannot be infringed.

Any other conclusion would make no sense. If Apple is permitted to pursue an infringement claim based on application programs that merely run under Lisa Desktop or Macintosh Finder, without requiring that the programs provide any of the allegedly similar displays, then there is no limit to the number of copyrights that Apple could assert. Under Apple's rationale, any application, whether a word processor, a spreadsheet, or even a computer game, could be the basis of an infringement claim merely because it runs within a window system, which has similarities to Apple's works. Therefore, Apple may not base its claim against Windows 2.03 on MacPaint, MacDraw or MacProject.

■ Furthermore, the ten remaining alleged similarities from Windows 2.03 are not covered by the Macintosh Finder copyrights either. Apple's Macintosh Finder is an acknowledged derivative work of Lisa Desktop, and is so registered. See Apple's Copyright Registration No. PA 336 105, Section 6(a) (Exhibit B). Section 103(b) of title 17 of the United States Code clearly provides that copyrights in a derivative work are limited to the "new material" added to the derivative work. Preexisting material in a derivative work which is carried forward from a prior work is only protected under the copyrights for the prior work. Id. Since the ten remaining allegedly infringing visual displays from Apple's 2.03 list are found in Lisa Desktop, they are carried forward from Lisa Desktop and covered by the Lisa Desktop copyrights. If Apple wishes to maintain a claim against Windows 2.03 based on these ten similarities, it must do so under the Lisa Desktop copyrights.

Apple responds that as creator and registered owner of all material, Apple is entitled to sue on the original Lisa works as well as the later Macintosh derivative works. Apple claims that there is nothing in the Copyright Act or the case law that would compel Apple to sue only on its original copyrights or to limit its protection of its derivative copyrights.

■ The case law clearly provides, however, that copyrights in derivative works protect only the incremental addition made to the preexisting material. *Silverman v. CBS, Inc.*, 870 F.2d 40, 49–50 (2d Cir.1989). Unless an alleged similarity arises from the new material in a derivative work, the copyright in the derivative work is not at issue, and there is no basis to include it in suit. The court should therefore dismiss the claims against Windows 2.03 based on the Macintosh Finder since the copyrights in Macintosh Finder do not extend to these ten alleged similarities.

Finally, there is no substantial similarity of ideas between Windows 2.03 and MacDraw, MacProject, LisaDraw and LisaProject. To establish a *prima facie* case of copyright infringement, plaintiff must prove that the works at issue are substantially similar in both ideas ("extrinsic test") and expression ("intrinsic test"). *Sid & Marty Krofft*, 562 F.2d at 1164. No jury could reasonably conclude that there is substantial similarity between Windows 2.03 and MacDraw, MacProject, LisaDraw and LisaProject.

The Windows 2.03 product includes a graphical operating environment and several application programs, such as Calendar (a basic calendar application), Terminal (a telecommunications program) and Reversi (a simple game program). In contrast, MacProject and LisaProject are application programs which provide scheduling and flow charting capabilities, and MacDraw and LisaDraw offer drawing capabilities to users. However, the functionality, idea and purpose behind the MacDraw, MacProject, LisaDraw and LisaProject application programs could not be more different from any of the programs found in Windows 2.03.

Apple responds that the underlying idea of MacDraw and LisaDraw is to "present, in the context of a graphics program to create charts and diagrams, a graphical user interface based on a desktop metaphor." Similarly, the idea of MacProject and LisaProject is to "present, in the context of a graphics application to create schedules and timeline related charts, a graphical user interface based on a desktop metaphor." Apple contends that even though these works provide

specific functions as applications programs, they "more importantly * * * reflect the graphical user interface of the Lisa and Macintosh computers."

Apple's argument that Windows's underlying idea, which is to provide a graphical user interface based on a desktop metaphor, and MacDraw's underlying idea, which is to provide drawing capabilities to the user, are substantially similar is ridiculous. The same can be said about MacProject, LisaDraw and LisaProject. As aptly noted by HP, "Apple's ongoing struggle to define *one idea* of sufficient breadth to encompass *all of the works* in suit reveals how illogical it is to maintain a claim for infringement of the application program works."

For the foregoing reasons, the court **GRANTS** Microsoft's motion for summary judgment based on MacPaint, MacDraw, MacProject, Macintosh Finder and LisaDraw as to Windows 2.03.

2.

The nine MacPaint visual displays asserted against Windows 3.0 are licensed. Accordingly, they provide no basis for a copyright claim against Windows 3.0.

Apple has asserted the same ten remaining alleged similarities of Windows 2.03 against Windows 3.0, namely items A1, A8, B1, B2, D1, D2, D3, G4, G5 and G6. As in the case with Windows 2.03, Apple's designated witness, Mr. Capps, testified that these remaining ten alleged similarities in Windows 3.0 are *not* present in Apple's MacPaint, MacDraw or MacProject applications. In addition, the twenty-six visual displays now asserted against Windows 3.0, namely A2, A4, A5, A9, E1, F3, F15, G7, J1, J6, N3, O4, P4, P5, P22, P33, P37, P41, P52, P56, P60, R1, R2, R3, T5 and W3, are licensed features. To the extent that they are present in MacPaint, MacDraw and MacProject, they may not serve as a basis for Apple's claims against Windows 3.0.

Moreover, Apple has asserted "additional similarities" pertaining to the following aspects of Windows 3.0: (1) Program Manager, (2) File Manager, and (3) Fonts, Colors and Miscellaneous. First, Apple claims that, like MacPaint, MacDraw and MacProject, Windows 3.0's Program Manager and File Manager are iconic filing systems. Yet, MacPaint, MacDraw and MacProject are not iconic filing systems. Lisa Desktop and Macintosh Finder are Apple's filing programs; hence, Apple may not base its claim against Windows 3.0 upon MacPaint, MacDraw and MacProject. Second, Apple alleges similarities based on proportional spaced fonts and muted colors. Yet, these fonts and colors are found in Lisa Desktop and are, therefore, properly covered under the Lisa Desktop copyrights. For the foregoing reasons, Microsoft is entitled to summary judgment on Apple's claims against Windows 3.0 based on MacPaint, MacDraw and MacProject.

In addition, MacDraw, MacProject and Macintosh Finder are derivative works. To the extent that any of the alleged similarities of Windows 3.0 appear on the screen when MacDraw, MacProject and Macintosh Finder are running, they are carried forward from LisaDraw, LisaProject and Lisa Desktop respectively. Accordingly, these allegedly similar visual displays are covered by LisaDraw, LisaProject and Lisa Desktop copyrights.

Lastly, MacDraw, MacProject, LisaDraw and LisaProject lack substantial similarity of ideas with Windows 3.0. As noted above, Windows presents a graphic operating environment and includes a few application programs. MacDraw and LisaDraw are applications which provide drawing capabilities to users, and MacProject and LisaProject provide scheduling and flow charting capabilities. These programs lack similarity of ideas.

Accordingly, the court finds that elimination of Apple's claims based on MacPaint, MacDraw, MacProject, Macintosh Finder, LisaDraw and LisaProject appropriate, and hereby **GRANTS** Microsoft's motion for summary judgment on these works. In so doing, the court has not unduly prejudiced Apple because all of its copyright allegations remain intact under its Lisa Desktop claim.

B.

In HP's Motion For Summary Judgment On The Literary And Application Program Works In Suit, HP seeks dismissal of LisaDraw, MacDraw, MacPaint, LisaProject and MacProject. Having considered the papers

submitted, the court hereby **GRANTS** HP's motion on the following grounds.

First, HP correctly contends that no substantial similarity of ideas exists between NewWave and any of the five application program works—LisaDraw, MacDraw, Mac-Paint, LisaProject and MacProject. New-Wave has no drawing, painting or project scheduling tools. As such, it cannot share those ideas, or be substantially similar in idea, to Apple's application programs.

Second, Apple has stipulated that the vast majority of the alleged similarities appear nowhere in the five application programs. Apple's own Rule 30(b)(6) witness, Mr. Capps, testified that none of the forty-four alleged NewWave similarities[4] appears in the LisaProject, and Apple stipulated that none of these alleged similarities appeared in the other four application programs—Lisa-Draw, MacDraw, MacPaint and MacProject. Based upon the foregoing, the court finds there can be no infringement of the five application programs.

Third, all of the alleged similarities that are actually displayed are generated by the System Software, not by the application programs. Since LisaDraw, LisaProject, Mac-Draw, MacPaint and MacProject do not create any of the alleged visual similarities in Apple's list, they cannot be infringed by NewWave.

### C.

 Finally, HP and Microsoft also urge the court to rule on their motions relating to damages, profits and prejudgment interest before trial. The court **DENIES** defendants' requests at this time. Instead, in the interest of judicial economy and convenience, the court hereby **BIFURCATES** the damages phase of the trial from the liability phase pursuant to FRCP 42(b). See *Ellingson Timber Co. v. Great Northern Railroad Co.,* 424 F.2d 497 (9th Cir.1970); *Baxter Travenol Laboratories, Inc. v. Le May,* 536 F.Supp. 247 (S.D.Ohio 1982). The court will address

defendants' damages motions only if the jury finds liability.

### VII.

Additionally, the court notified the parties at the May 5, 1993, hearing that payment of fees and expenses to jurors in civil trials may be suspended before the June 28 trial date. In response, counsel for Apple suggested that Apple, HP and Microsoft share the cost of the jurors' fees and expenses. Under such an arrangement the jurors would not know the source of their compensation and all parties would have to agree to the arrangement. The court asked the parties to investigate the legality and appropriateness of such a plan and to prepare the matter for discussion at the pretrial conference on June 1, 1993, at 2:00 p.m.

Since the May 5 hearing, the court has found two cases which bear on the issue. In *United States v. Branscome,* 682 F.2d 484, 485 (4th Cir.1982), the court held that selection of volunteers to serve on a grand jury from a pool of prospective jurors who had been randomly selected violated the Jury Selection and Service Act, 28 U.S.C. § 1861–76. The court noted that the selection of volunteers introduced a subjective criterion for grand jury service not authorized by the Act, and violated Congress' intent to ensure random selection throughout the entire selection process. Id.

Similarly, in *United States v. Kennedy,* 548 F.2d 608, 610 (5th Cir.1977), the court ruled that the trial court's emergency use of volunteer jurors selected from citizens who had just finished a term of jury service violated both the letter and spirit of the Jury Selection and Service Act. Section 1866(f) of title 28 of the United States Code requires random selection of jurors. The court stated that,

> Providing prospective jurors with complete discretion whether or not to serve negates the statutory mandate of random selection.

Id. at 612.

The court added:

---

4. After the court's decision in *Apple Computer, Inc. v. Microsoft, Corp.,* 759 F.Supp. 1444, 1452 (N.D.Cal.1991), fifty-four items pertaining to NewWave remained: A1, A8, B1, B2, D1–3, G1–2, G4–6, G10–21, G23–33, H1–6, I1–2, I4, I6–11, J8–11. This list consists of the ten items allegedly applicable to NewWave because they are found in Windows 2.03 (A1, A8, B1, B2, D1–3, G4, G5, G6; id at 1449–50) ("the ten Windows items"), and the forty-four items applicable to NewWave alone (G1–2, G10–21, G23–33, H1–6, I1–2, I4, I6–11, J8–11) ("the 44 NewWave items").

We need not speculate as to what sort of biases will be reflected in a jury chosen on the basis of its members' willingness to depart from their daily business and serve as jurors. It is enough to recognize that a substantial variable, not contemplated by the Act's few, narrow categories of qualifications, exemptions, and excuses, has confounded the selection process.

Id.

Unlike the jurors in *Branscome* and *Kennedy*, the jurors in this case would not be volunteers. As required by 28 U.S.C. § 1866(f), they would be selected in a random manner from the usual jury pool. Any juror selected would not have the option of declining service unless he or she were unqualified, fell within one of the narrowly drawn exemptions, or provided a legitimate excuse. Thus, it appears to the court that the method of compensating and reimbursing jurors proposed above could be lawful. As a precaution, the court reiterates its earlier directive for the parties to research the issue and to notify the court of their findings.

## VIII.

In summary, the court will submit the following questions for the trial which is scheduled to commence on June 28, 1993:

(1) Are items G28, G29 and G33 in all versions of NewWave and H2 in New-Wave Developer's Release alone substantially similar to their equivalents in Apple's works?

(2) Are any of HP's works as a whole virtually identical to any of Apple's works?

(3) Are any of Microsoft's works as a whole virtually identical to any of Apple's works?

(4) If any of HP's works infringe any of Apple's works, is Microsoft contributorily liable for any infringement on the part of HP?

(5) If any of Microsoft's works infringe any of Apple's works, is HP jointly and severally liable for any infringement on the part of Microsoft?

IT IS SO ORDERED.

TABLE A:

**Macintosh/Lisa**

| Items | A1 | D1 | G4 | G13 | J10 | G28 | G29 | G33 | H2 |
|---|---|---|---|---|---|---|---|---|---|
| NewWave 3.0 | G | G | G | G | G | D | D | D | G |
| NewWave 1.0 | G | G | G | G | G | D | D | D | G |
| NewWave 1.0 Developer's Release | G | G | G | G | G | D | D | D | D |
| Windows 3.0 | G | G | G | | | | | | |
| Windows 2.03 | G | G | G | | | | | | |

Key:

D = Deny.
G = Grant.